Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MIKE WANG, derivatively on behalf of THE HONEST COMPANY, INC.,<br><br>Plaintiff,<br><br>v.<br><br>NIKOLAOS VLAHOS, KELLY KENNEDY, JESSICA WARREN, KATIE BAYNE, SCOTT DAHNKE, SUSAN GENTILE, ERIC LIAW, JEREMY LIEW, AVIK PRAMANIK, and JAMES WHITE,<br><br>Defendants,<br><br>and<br><br>THE HONEST COMPANY, INC.,<br><br>Nominal Defendant. | Case No.:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

## INTRODUCTION

Plaintiff Mike Wang ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant The Honest Company, Inc. ("Honest" or the "Company"), files this Verified Shareholder Derivative Complaint against Nikolaos Vlahos, Kelly Kennedy, Jessica Warren, Katie Bayne, Scott Dahnke, Susan Gentile, Eric Liaw, Jeremy Liew, Avik Pramanik, and James White (collectively, the "Individual Defendants," and together with Honest, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Honest, unjust enrichment, and for contribution under Sections 11(f) of the Securities Act of 1933 (the "Securities Act") and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Honest, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This shareholder derivative action seeks to remedy wrongdoing committed by Honest's officers and directors between May 5, 2021 through August 12, 2021 (the "Relevant Period") involving misleading statements and omissions made in connection with the Company's May 2021 initial public offering (the "IPO"), failures to correct the misleading statements and omissions, and additional misleading statements that followed the IPO, as well as certain other misconduct.

2. Honest is purportedly a digitally-native, mission-driven brand focused on the clean lifestyle movement. The Company seeks to develop "clean, sustainable, effective, and thoughtfully designed products." The Company's has three principal product categories: (1) Diapers and Wipes, (2) Skin and Personal Care, and (3) Household and Wellness. These categories represented 63%, 26%, and 11% of Honest's revenue in 2020, respectively.

3. The onset of the COVID-19 pandemic caused consumer demand for the Company's diapers and wipes to surge. For instance, in the second quarter of 2020, the Company saw 19% growth in the Diapers and Wipes category compared to the comparable quarter of 2019, due to consumer stock-up purchases.

4. Though it was widely known that consumers and retailers were stockpiling consumer products during the pandemic's early stages, the Company undertook measures to bolster its supply chain, "such as securing secondary suppliers and ensuring sufficient inventory to support our continued growth" (the "Stockpiling Misconduct"). As a result, during the first six months of 2021, the Company experienced a $5.7 million increase in inventory, which it attributed to the "timing of inventory purchases."

5. To pursue its IPO, Honest filed a registration statement on Form S-1 with the SEC on April 9, 2021, which was subsequently amended and eventually declared effective on May 4, 2021 (the Form S-1, as amended, the "Registration Statement"). The Company filed its final prospectus on May 6, 2021 (the "Prospectus").

6. In April 2021, mere weeks prior to the IPO, the Board approved a $35 million dividend to holders of its common stock and redeemable convertible preferred stock as of May 3, 2021, which was paid on June 29, 2021 (the "2021 Dividend").

7. On May 5, 2021, Honest's common stock began trading on the NASDAQ Global Select Market ("NASDAQ"), and on May 7, 2021, the Company completed its IPO of 25,807,000 shares. The Company sold 6,451,613 shares and certain existing

stockholders sold 23,226,437 shares in the IPO. The IPO price was $16.00 per share, and the Company received aggregate net proceeds of approximately $91.1 million.

8. In the Registration Statement and throughout the Relevant Period, including in the Registration Statement, the Individual Defendants made or caused the Company to make false and misleading statements and/or made omissions of material fact necessary to prevent the statements from being misleading. Specifically, the Individual Defendants touted the Company's business, operations, and prospects while failing to disclose adverse impacts on the Company due to consumer and retailer stockpiling, deceleration of demand for the Company's products, and the Company's engagement in the Stockpiling Misconduct.

9. The Individual Defendants' misrepresentations had the effect of misleading the investing public and artificially inflating the price of the Company's stock at and/or around the time of the Company's IPO, as well as throughout the Relevant Period.

10. The truth emerged before market opening on August 13, 2021, when the Company issued a press release. The press release announced financial results for fiscal quarter ended June 30, 2021, revealing a net loss of $20 million for the quarter, a striking contrast to the Company's net loss of only $0.4 million in the same quarter of 2020. Further, the press release disclosed "an estimated $3.7 million COVID-19 stock-up impact primarily in Diapers and Wipes in the prior year period." It further disclosed that revenues in the Diapers and Wipes category declined 2% compared to the same quarter of 2020. Additionally, revenues for the Household and Wellness category declined 6% compared with the second quarter of 2020 "as consumer and customer demand for sanitization products decreased as consumers became vaccinated and customers managed heavy levels of inventory."

11. On this news, the price of the Company's publicly traded stock fell $3.98, or approximately 28%, to close at $10.07 per share on August 13, 2021. By August 19, 2021,

the Company's share price fell further, closing at $9.16 per share, amounting to a nearly 43% decline from the IPO price per share of $16.00.

12. The Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements that failed to disclose, *inter alia*: (1) the Company's business, operations, and prospects were significantly impacted by stockpiling of the Company's products; (2) despite the likely impacts of consumer and customer stockpiling behavior on the Company's future prospects, the Company engaged in the Stockpiling Misconduct to support future sales and growth, which were not reasonably likely to materialize; (3) demand for the Company's products was decelerating; (4) as a result of the foregoing, Honest's financial results were likely to be materially negatively impacted; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading at all relevant times.

13. The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact throughout the Relevant Period, rendering the Individual Defendants personally liable to the Company for breaching their fiduciary duties.

14. In further breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the Stockpiling Misconduct, which harmed the Company and wasted corporate assets.

15. In further breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls and to fail to establish an internal audit function.

16. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), its founder and Chief Creative Officer ("CCO"), and five of its non-employee directors (collectively, the "Securities Action Defendants")[1] to two securities fraud class actions lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Actions"), and further subjected the Company to the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

17. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the Securities Action Defendants' liability in the Securities Class Actions, of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

19. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the claims herein raise a federal question under Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)) and Section 21D of the Exchange Act (15 U.S.C.

---

[1] The "Securities Action Defendants" are as follows: CEO Vlahos, CFO Kennedy, CCO Warren, and directors Bayne, Dahnke, Liaw, Liew, and Pramanik.

§ 78u-4(f)). Plaintiff's claims also raise a federal question relating to the claims made in the Securities Class Action based on violations of the Securities Act.

20. This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a).

21. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22. Venue is proper in this District because: (1) Honest's principal executive offices are in this District; (2) a substantial portion of the transactions and wrongs complained of herein occurred in this District; (3) the Defendants have conducted business in this District, and (4) Defendants' actions have had an effect in this District.

## PARTIES

**Plaintiff**

23. Plaintiff has owned Company stock since the beginning of the Relevant Period and has continuously owned the stock since then.

**Nominal Defendant Honest**

24. Honest is incorporated in Delaware and has its principal executive offices at 12130 Millennium Drive, #500, Los Angeles, California 90094. The Company's shares trade on the NASDAQ under the ticker symbol "HNST."

**Defendant Nikolaos Vlahos**

25. Defendant Nikolaos Vlahos ("Vlahos") has served as the Company's CEO and as a member of the Board since March 2017.

26. The Prospectus states that Defendant Vlahos' annual base salary is $825,000, and that "he is eligible for an annual target cash incentive payment equal to 50% of his annual base salary."

**Defendant Kelly Kennedy**

27. Defendant Kelly Kennedy ("Kennedy") has served as Honest's CFO since January 2021 and was previously CFO at Bartell Drugs, a pharmacy chain.

**Defendant Jessica Warren**

28. Defendant Jessica Warren a/k/a Jessica Alba ("Warren") is one of the Company's founders and has served as the Company's CCO since July 2011. Warren is a globally recognized and influential Mexican-American business leader, entrepreneur, advocate, actress, and New York Times bestselling author.

29. The Prospectus states that Defendant Warren's current annual base salary is $600,000, "which will increase to $700,000 effective February 1, 2022." In addition, she is eligible for an annual target cash incentive payment equal to 55% of her annual base salary, which amount will increase to 70% of Warren's then-current base salary starting January 1, 2022.

**Defendant Katie Bayne**

30. Defendant Katie Bayne ("Bayne") has served as a Company director since October 2018. She is currently Chair of the Compensation Committee and a member of the Audit Committee.

31. According to the Prospectus, Defendant Bayne is entitled to annual cash retainers of $50,000 for her service as a non-employee director, $15,000 for her service as Chair of the Compensation Committee, and $15,000 for her service as a member of the Audit Committee, in addition to certain grants of equity compensation.

**Defendant Scott Dahnke**

32. Defendant Scott Dahnke ("Dahnke") has served as a member of the Board since June 2018. According to SEC filings, Defendant Dahnke is one of two members of a managing board of the general partner of THC Shared Abacus, LP, which sold 19,017,945 shares of the Company's Common stock on May 7, 2021 at a price of $16 per share, for proceeds of approximately $304 million.

33. According to the Prospectus, Defendant Dahnke is entitled to an annual cash retainer of $50,000 for his service as a non-employee director, in addition to certain grants of equity compensation.

**Defendant Susan Gentile**

34. Defendant Susan Gentile ("Gentile") has served as a member of the Board since May 4, 2021. She currently serves as Chair of the Audit Committee.

35. According to the Prospectus, Defendant Gentile is entitled to annual cash retainers of $50,000 for her service as a non-employee director and $20,000 for her service as Chair of the Audit Committee, in addition to certain grants of equity compensation.

**Defendant Eric Liaw**

36. Defendant Eric Liaw ("Liaw") has served as a member of the Board since November 2013. He currently serves as a member of the Audit Committee and the Compensation Committee. Defendant Liaw is a General Partner of Institutional Venture Partners XIII, L.P., which sold 1,200,000 Company shares in the IPO for proceeds of $19.2 million and which beneficially owned 11.5% of the Company following the IPO.

37. According to the Prospectus, Defendant Liaw is entitled to annual cash retainers of $50,000 for his service as a non-employee director, $15,000 for his service as a member of the Audit Committee, and $7,500 for his service as a member of the Compensation Committee, in addition to certain grants of equity compensation.

**Defendant Jeremy Liew**

38. Defendant Jeremy Liew ("Liew") has served as a member of the Board since September 2011. He is currently a member of the Nominating and Corporate Governance Committee. According to a Form 4 filed by Defendant Liew with the SEC on May 10, 2021, Liew is a director of the general partner of the general partner of Lightspeed Venture Partners Select, L.P., which sold 82,648 shares of Company common stock on May 7, 2021 in connection with the IPO, for proceeds of $1,322,368.

39. According to the Prospectus, Defendant Liew is entitled to annual cash retainers of $50,000 for his service as a non-employee director and $5,000 for his service as a member of the Nominating and Corporate Governance Committee, in addition to certain grants of equity compensation.

**Defendant Avik Pramanik**

40. Defendant Avik Pramanik ("Pramanik") has served as a member of the Board since June 2018. He is currently a member of the Compensation Committee and the Nominating and Corporate Governance Committee. Defendant Pramanik is a Partner at *L* Catterton Partners, a private equity firm. THC Shared Abacus, LP, a fund affiliated with *L* Catterton Partners, sold 19,017,945 shares of Company common stock in the IPO for proceeds of $304,287,120.

41. According to the Prospectus, Defendant Pramanik is entitled to annual cash retainers of $50,000 for his service as a non-employee director, $7,500 for his service as a member of the Compensation Committee, and $5,000 for his service as a member of the Nominating and Corporate Governance Committee, in addition to certain grants of equity compensation.

**Defendant James White**

42. Defendant James White ("White") has served as Board Chair since May 4, 2021. In addition, he is currently Chair of the Nominating and Corporate Governance Committee.

43. According to the Prospectus, Defendant White is entitled to annual cash retainers of $50,000 for his service as a non-employee director, $125,000 for his service as the non-executive Chair of the Board, and $10,000 his for service as Chair of the Nominating and Corporate Governance Committee, in addition to certain grants of equity compensation.

**INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Background**

44. Honest is a Los Angeles-based consumer products company that describes itself as focused on "the clean lifestyle movement, creating a community for conscious consumers and seeking to disrupt multiple consumer product categories." The Company has three product categories: (1) Diapers and Wipes; (2) Skin and Personal Care; and (3)

Household and Wellness. These categories represented 63%, 26% and 11% of the Company's 2020 revenue, respectively.

45. The onset of the COVID-19 pandemic resulted in increased demand for the Company's sanitization products. In response, the Company accelerated the development timeline for certain products, eventually launching new products in 2020 that included a disinfecting spray and alcohol wipes.

46. In 2020, there was widespread awareness of stockpiling behavior related to the ongoing pandemic,[2] and the Individual Defendants knew that the surge of demand for the Company's products would lead to consumers and customers having stockpiled its products, yet the Individual Defendants caused the Company to engage in the Stockpiling Misconduct.

47. In addition, the Individual Defendants made or caused the Company to make materially false and misleading statements or omissions of material fact concerning the Stockpiling Misconduct, stock-up purchases, and the impacts of the foregoing on Honest's current and future financial prospects.

48. Moreover, the Individual Defendants failed to establish or cause the Company to establish an internal audit function, as evidenced by the Company's Audit Committee Charter, which reveals that the Company "does not currently have an Internal Audit Function."

**<u>Stockpiling Misconduct</u>**

49. The COVID-19 pandemic has had far-reaching consequences in the United States and throughout the world, including by leaving millions dead, disrupting the lives of many others, and impacting a great deal of economic activity.

---

[2] https://www.washingtonpost.com/national/coronavirus-toilet-paper-shortage-panic/2020/04/07/1fd30e92-75b5-11ea-87da-77a8136c1a6d_story.html (last accessed December 16, 2021).

50. The pandemic led to significant "panic buying," or stockpiling, in which consumers would purchase excess goods, including food and personal care items.[3] This panic buying included or affected products related to COVID-19.[4]

51. To protect against the virus that causes COVID-19, the U.S. EPA has recommended "surface cleaning" as one part of a larger strategy to contain the virus, which spread through airborne particles and droplets.[5]

52. In response to increased demand for the Company's sanitizing products, Honest accelerated timelines for certain product launches, and launched a disinfecting spray and alcohol wipes in 2020.

53. Honest's products, particularly those related to sanitizing, became subject to stock-up behaviors. During the quarter ended June 30, 2020, the Company experienced an estimated "$3.7 million COVID-19 stock-up impact" primarily in its Diapers and Wipes product category.

54. The significant near-term surge in demand for the Company's products due to stockpiling necessarily lessened future demand for the Company's products. Nevertheless, the Company engaged in the Stockpiling Misconduct in anticipation of future expansion of sales. Specifically, the Company stated that it has "taken measures to bolster key aspects of its supply chain, such as . . . ***ensuring sufficient inventory to support our continued growth in the face of the pandemic.***" (Emphasis added.)

55. The Stockpiling Misconduct resulted in the Company experiencing a $5.7 million increase in inventory for the first half of 2020, which the Company attributed to the "timing of inventory purchases."

56. During the period when the Individual Defendants were causing Honest to

---

[3] https://www.bbc.com/worklife/article/20200304-coronavirus-covid-19-update-why-people-are-stockpiling (last accessed December 16, 2021).
[4] https://www.bloomberg.com/news/articles/2020-03-04/-hamster-buying-depletes-supermarket-shelves-on-virus-fears (last accessed December 16, 2021).
[5] https://www.epa.gov/coronavirus/indoor-air-and-coronavirus-covid-19 (last accessed December 16, 2021).

engage in the Stockpiling Misconduct, demand for sanitizing and disinfecting products was decelerating.

**2021 Dividend**

57. While demand for Honest's products was decelerating and the Individual Defendants were causing the Company to engage in the Stockpiling Misconduct, and mere weeks prior to the IPO, the Board approved the 2021 Dividend, a huge payout to insiders.

58. In April 2021, the Board approved a cash dividend of $35 million to the holders of record of the Company's common stock and its redeemable convertible preferred stock as of May 3, 2021, contingent upon the IPO's closing and payable no later than June 30, 2021. The Board that approved the 2021 Dividend consisted of Defendants Bayne, Dahnke, Liaw, Liew, Pramanik, Vlahos, and Warren.

59. The Prospectus states that the following amounts were payable to the following related parties under the 2021 Dividend:

(a) $13,108,764 to THC Shared Abacus, LP, a fund affiliated with *L* Catterton Partners, of which Defendant Dahnke is co-CEO and Defendant Pramanik is a partner;

(b) $4,853,915 to Institutional Venture Partners XIII, L.P., of which Defendant Liaw is a General Partner;

(c) $4,293,952 to entities affiliated with Lightspeed Venture Partners, a venture capital firm with which Defendant Liew is affiliated as a director of Lightspeed Ultimate General Partner Select, Ltd., the general partner of the general partner of Lightspeed Venture Partners Select, L.P.;

(d) $3,242,899 to entities affiliated with Fidelity;

(e) $2,633,660 to entities affiliated with Defendant Warren;

(f) $1,781,494 to entities affiliated with General Catalys; and

(g) $35,107 to Nikolaos and Angela Vlahos 2006 Trust, a trust in which Defendant Vlahos and his wife are trustees and share voting and investment power.

60. As evidenced by the foregoing, Defendants Dahnke, Liaw, Liew, Pramanik, Vlahos, and Warren used their positions as members of the Board to cause Honest to pay handsome dividends to themselves or to their affiliated entities.

61. The 2021 Dividend was paid on June 29, 2021, or during the Company's fiscal quarter ended June 30, 2021. It totaled $35 million, and $20.6 million of that amount was paid to holders of the Company's redeemable convertible preferred stock. During the same fiscal quarter, Honest reported a net loss of $20 million.

**May 2021 IPO**

62. Beginning in early 2021, the Individual Defendants initiated formal steps to take the Company public. The Company filed a draft registration statement on Form DRS with the SEC on January 29, 2021. The Company filed its Form S-1 on April 9, 2021, which was later amended. On April 26, 2021, the Company filed the final amendment to the Form S-1, and on May 4, 2021, the Registration Statement was declared effective. On May 6, 2021, the Company filed the Prospectus.

63. The Company's stock began trading publicly on May 5, 2021. The Company sold 6,451,613 shares and certain existing stockholders sold an aggregate of 19,355,387 shares, for a total offering of 25,807,000 shares. The IPO's underwriters fully exercised their options to purchase an additional 3,871,050 shares from the selling stockholders. The Company received aggregate net proceeds of approximately $91.1 million. The Prospectus states that the net proceeds received were to be used for "general corporate purposes," including "operating expenses, working capital and capital expenditures for future growth, including marketing and direct-to-consumer advertising investments, innovation and adjacent product category expansion, international growth investment and organizational capabilities investments." The Prospectus also asserted that: "We may also use a portion

of the net proceeds to acquire complementary businesses, products, services or technologies." The IPO was complete on May 7, 2021.

64. Not even two months after the IPO, on June 29, 2021, the Company paid the 2021 Dividend in the amount of $35 million to holders of the Company's common stock and redeemable convertible preferred stock as of May 3, 2021, a date occurring just prior to the IPO.

**Disclosure Requirements**

65. SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies like Honest. For instance, Item 303(b)(2)(i) required Honest to:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, would be material to an understanding of the registrant's results of operations.

66. In addition, Item 303(b)(2)(ii) required Honest to:

> Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

67. Furthermore, Item 105 of Regulation S-K required the Individual Defendants to provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky."

68. Thus, even after the IPO, the Individual Defendants had an affirmative duty to disclose. Pursuant to Item 303 of Regulation S-K, this duty requires that all Form 10-Q and Form 10-K filings include a section on "[m]anagement's discussion and analysis of financial condition and results of operations" that includes, *inter alia*:

i. "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations";

ii. "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations";

iii. "descriptions and amounts of matters that have had a material impact on reported operations"; and

iv. "matters that are reasonably likely based on management's assessment to have a material impact on future operations."

69. Therefore, after the IPO and throughout the Relevant Period, the Individual Defendants had a duty to cause the Company to disclose all material facts related to: (1) consumer and retailer stockpiling of the Company's products; (2) the Stockpiling Misconduct; (3) decelerating demand for the Company's products; (4) impacts of the foregoing on the Company's business, operations, and prospects; and (5) the Company's failure to maintain adequate internal controls.

**False and Misleading Statements Made in Connection with the IPO**

70. With respect to the Company's past performance and financial results, the Registration Statement stated as follows, in pertinent part:

> As we have executed against our Innovation Strategy, we have been successful in reinvigorating growth, improving product mix, significantly enhancing our gross margin profile and turning profitable on an adjusted EBITDA basis. We have achieved the following financial results:
>
> - From 2018 to 2020, we grew revenue by a 12% compound annual growth rate, or CAGR, from $237.9 million to $300.5 million, with only a slight decline in 2019 as we offset declines from Non-Core Products;
> - We achieved 27.6% year-over-year revenue growth in 2020, recording year-over-year revenue growth rates of 16.4%, 35.5%, and 116.5% in our Diapers and Wipes, Skin and Personal Care and Household and Wellness categories, respectively;

- We also increased gross margin by 1,080 basis points from 25.1% in 2018 to 35.9% in 2020, by driving growth in higher-margin products and channels, leveraging our strategic relationships with retailers, gaining leverage on fixed costs in fulfillment, as well as executing on accretive product innovation; and
- In 2020, we reported a net loss of $14.5 million and adjusted EBITDA of $11.2 million, or 4% of revenue.

71. With respect to impacts associated with COVID-19, the Registration Statement stated as follows, in pertinent part: "[c]hanges in macro-level consumer spending trends, including as a result of the COVID-19 pandemic, ***could*** result in fluctuations in our operating results." (Emphasis added.) In addition, it stated the following, in pertinent part:

> The COVID-19 pandemic has caused general business disruption worldwide beginning in January 2020. The full extent to which the COVID-19 pandemic will directly or indirectly impact our cash flow, business, financial condition, results of operations and prospects will depend on future developments that are uncertain.
>
> As a result of the COVID-19 pandemic, we temporarily closed our headquarters, supported our employees and contractors to work remotely, and implemented travel restrictions. These actions represented a significant change in how we operated our business, but we believe that we successfully navigated this transition. In an effort to provide a safe work environment for our employees, we have implemented various social distancing measures, including replacing in-person meetings with virtual interactions. We will continue to take actions as may be required or recommended by government authorities or as we determine are in the best interests of our employees and other business partners in light of the pandemic.
>
> We have experienced relatively minor impacts on our inventory availability and delivery capacity since the outbreak, none of which has materially impacted our ability to service our consumers and retail and third-party ecommerce customers. **We have taken measures to bolster key aspects of our supply chain, such as securing secondary suppliers and ensuring sufficient inventory to support our continued growth in the face of the pandemic.** We continue to work with our existing manufacturing, logistics and other supply chain partners to ensure our ability to service our consumers and retail and third-party ecommerce customers.

> **We believe COVID-19 has been one of the drivers of demand in our Digital channel as consumers have shifted to online shopping amid the pandemic. Additionally, our Household and Wellness product category has benefitted from increasing demand for sanitization products. We accelerated our development timeline for certain product launches, launching our disinfecting spray and alcohol wipes in 2020. There is no assurance that we will continue to experience such increases in demand.** We may see a decline in use of online shopping and demand for sanitization products when the COVID-19 pandemic subsides.
>
> The operations of our retail partners, manufacturers and suppliers have also been impacted by the COVID-19 pandemic. While the duration and extent of the COVID-19 pandemic depends on future developments that cannot be accurately predicted at this time, it has already had an adverse effect on the global economy and the ultimate societal and economic impact of the COVID-19 pandemic remains unknown. In particular, the conditions caused by this pandemic may negatively impact collections of accounts receivable and reduce expected spending from new consumers, all of which could adversely affect our business, financial condition, results of operations and prospects during fiscal 2021 and potentially future periods.

(Emphasis added.)

72. The Registration Statement was materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company's business, operations, and prospects were significantly impacted by stockpiling of the Company's products; (2) despite the likely impacts of consumer and customer stockpiling behavior on the Company's future prospects, the Company engaged in the Stockpiling Misconduct to support future sales and growth, which were not reasonably likely to materialize; (3) demand for the Company's products was decelerating; (4) as a result of the foregoing, Honest's financial results were likely to be materially negatively impacted; and (5) the Company failed to maintain adequate internal controls.

**False and Misleading Statements Made During the Relevant Period**

***May 6, 2021 Prospectus***

73. On May 6, 2021, the Company filed the Prospectus with the SEC. With respect to Honest's past performance and prospects, the Prospectus stated the following, in pertinent part:

> As we have executed against our Innovation Strategy, we have been successful in reinvigorating growth, improving product mix, significantly enhancing our gross margin profile and turning profitable on an adjusted EBITDA basis. We have achieved the following financial results:
>
> - From 2018 to 2020, we grew revenue by a 12% compound annual growth rate, or CAGR, from $237.9 million to $300.5 million, with only a slight decline in 2019 as we offset declines from Non-Core Products;
> - We achieved 27.6% year-over-year revenue growth in 2020, recording year-over-year revenue growth rates of 16.4%, 35.5%, and 116.5% in our Diapers and Wipes, Skin and Personal Care and Household and Wellness categories, respectively;
> - We also increased gross margin by 1,080 basis points from 25.1% in 2018 to 35.9% in 2020, by driving growth in higher-margin products and channels, leveraging our strategic relationships with retailers, gaining leverage on fixed costs in fulfillment, as well as executing on accretive product innovation; and
> - In 2020, we reported a net loss of $14.5 million and adjusted EBITDA of $11.2 million, or 4% of revenue.

74. With respect to impacts associated with COVID-19, the Prospectus stated the following, in pertinent part: "[c]hanges in macro-level consumer spending trends, including as a result of the COVID-19 pandemic, ***could*** result in fluctuations in our operating results." (Emphasis added.) In addition, it stated the following, in pertinent part:

> The COVID-19 pandemic has caused general business disruption worldwide beginning in January 2020. The full extent to which the COVID-19 pandemic will directly or indirectly impact our cash flow, business, financial condition, results of operations and prospects will depend on future developments that are uncertain.
>
> As a result of the COVID-19 pandemic, we temporarily closed our headquarters, supported our employees and contractors to work remotely, and

implemented travel restrictions. These actions represented a significant change in how we operated our business, but we believe that we successfully navigated this transition. In an effort to provide a safe work environment for our employees, we have implemented various social distancing measures, including replacing in-person meetings with virtual interactions. We will continue to take actions as may be required or recommended by government authorities or as we determine are in the best interests of our employees and other business partners in light of the pandemic.

We have experienced relatively minor impacts on our inventory availability and delivery capacity since the outbreak, none of which has materially impacted our ability to service our consumers and retail and third-party ecommerce customers. **We have taken measures to bolster key aspects of our supply chain, such as securing secondary suppliers and ensuring sufficient inventory to support our continued growth in the face of the pandemic.** We continue to work with our existing manufacturing, logistics and other supply chain partners to ensure our ability to service our consumers and retail and third-party ecommerce customers.

**We believe COVID-19 has been one of the drivers of demand in our Digital channel as consumers have shifted to online shopping amid the pandemic. Additionally, our Household and Wellness product category has benefitted from increasing demand for sanitization products. We accelerated our development timeline for certain product launches, launching our disinfecting spray and alcohol wipes in 2020. There is no assurance that we will continue to experience such increases in demand.** We may see a decline in use of online shopping and demand for sanitization products when the COVID-19 pandemic subsides.

The operations of our retail partners, manufacturers and suppliers have also been impacted by the COVID-19 pandemic. While the duration and extent of the COVID-19 pandemic depends on future developments that cannot be accurately predicted at this time, it has already had an adverse effect on the global economy and the ultimate societal and economic impact of the COVID-19 pandemic remains unknown. In particular, the conditions caused by this pandemic may negatively impact collections of accounts receivable and reduce expected spending from new consumers, all of which could adversely affect our business, financial condition, results of operations and prospects during fiscal 2021 and potentially future periods.

(Emphasis added.)

***June 17, 2021 10-Q***

75. On June 17, 2021, Honest filed its quarterly report on Form 10-Q for the first quarter of 2021 (the "2021Q1 10-Q"). The 2021Q1 10-Q was signed by Vlahos and Kennedy and contained certifications signed by Defendants Vlahos and Kennedy pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements in the 2021Q1 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by Honest or its officers or directors.

76. With respect to impacts associated with COVID-19, the 2021Q1 10-Q stated the following, in pertinent part: "[c]hanges in macro-level consumer spending trends, including as a result of the COVID-19 pandemic, could result in fluctuations in our operating results." In addition, it stated the following, in pertinent part:

> The COVID-19 pandemic has caused general business disruption worldwide beginning in January 2020. The full extent to which the COVID-19 pandemic will directly or indirectly impact our cash flow, business, financial condition, results of operations and prospects will depend on future developments that are uncertain.
>
> As a result of the COVID-19 pandemic, our headquarters is temporarily closed as we support our employees and contractors to work remotely. We have also implemented travel restrictions. These actions represent a significant change in how we operate our business, but we believe that we successfully navigated this transition. In an effort to provide a safe work environment for our employees, we have implemented various social distancing measures, including replacing many in-person meetings with virtual interactions. We will continue to take actions as may be required or recommended by government or health authorities or as we determine are in the best interests of our employees and other business partners in light of the pandemic.
>
> We have experienced relatively minor impacts on our inventory availability and delivery capacity since the outbreak, none of which has materially impacted our ability to service our consumers and retail and third-party ecommerce customers. **We have taken measures to bolster key aspects of**

> **our supply chain, such as securing secondary suppliers and ensuring sufficient inventory to support our continued growth in the face of the pandemic. We continue to work with our existing manufacturing, logistics and other supply chain partners to ensure our ability to service our consumers and retail and third-party ecommerce customers.**
>
> **We believe COVID-19 has been one of the drivers of demand in our Digital channel as consumers shifted to online shopping amid the pandemic. Additionally, our Household and Wellness product category has benefited from increasing demand for sanitization products. We accelerated our development timeline for certain product launches, launching our disinfecting spray and alcohol wipes in 2020. We have seen increased consumer willingness to return to in-store shopping as the economy opens and more of the population is vaccinated. This has driven a channel shift and demand acceleration driving revenue growth within our Retail channel in 2021.**
>
> The operations of our retail partners, manufacturers and suppliers have also been impacted by the COVID-19 pandemic. While the duration and extent of the COVID-19 pandemic depends on future developments that cannot be accurately predicted at this time, it has already had an adverse effect on the global economy and the ultimate societal and economic impact of the COVID-19 pandemic remains unknown. In particular, the conditions caused by this pandemic may negatively impact collections of accounts receivable and reduce expected spending from new consumers, all of which could adversely affect our business, financial condition, results of operations and prospects during fiscal 2021 and potentially future periods.

(Emphasis added.)

77. With respect to the Company's disclosure controls and procedures, the 2021Q1 10-Q stated the following, in pertinent part:

> We maintain "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act, that are designed to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms and (2) accumulated and communicated to our management, including our principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure. Our management, with the participation of our Chief Executive

> Officer and Chief Financial Officer, evaluated, as of the period ended March 31, 2021, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act). **Based on that evaluation, our principal executive officer and principal financial officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level.**

(Emphasis added.)

78. With respect to purported limitations on effectiveness of controls and procedures, the 2021Q1 10-Q stated the following, in pertinent part:

> In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply judgment in evaluating the benefits of possible controls and procedures relative to their costs.

79. The Prospectus and the 2021Q1 10-Q were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company's business, operations, and prospects were significantly impacted by stockpiling of the Company's products; (2) despite the likely impacts of consumer and customer stockpiling behavior on the Company's future prospects, the Company engaged in the Stockpiling Misconduct to support future sales and growth, which were not reasonably likely to materialize; (3) demand for the Company's products was decelerating; (4) as a result of the foregoing, Honest's financial results were likely to be materially negatively impacted; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading at all relevant times.

**The Truth Emerges**

80. On August 13, 2021, before the market opened, the Company issued a press release titled "The Honest Company Reports Second Quarter 2021 Financial Results." The press release reported financial results for the three and six months ended June 30, 2021.

81. In the press release, Honest reported a net loss of $20 million for the second quarter of 2021. This net loss was a striking contrast to the Company's net loss of $0.4 million during the second quarter of 2020. The press release reported that revenue growth in the second quarter of 2021 was only 3%. It also reported that revenue in the Diapers and Wipes product category declined 2% as compared to the second quarter of 2020. Furthermore, the press release disclosed "an estimated $3.7 million COVID-19 stock-up impact primarily in Diapers and Wipes during the three months ended June 30, 2020."

82. Regarding Household and Wellness revenue, Honest disclosed that "revenue declined 6% from the second quarter of 2020 as consumer and customer demand for sanitization products decreased as consumers became vaccinated and customers managed heavy levels of inventory." Furthermore, the press release stated that revenue in the Household and Wellness category "declined 31% as compared to the second quarter of 2019 as we simplified the product portfolio while discontinuing certain non-core products that did not align with our revamped product strategy."

83. The press release stated as follows, in relevant part:

> LOS ANGELES, Aug. 13, 2021 (GLOBE NEWSWIRE) -- The Honest Company (NASDAQ: HNST), a digitally native, mission-driven brand focused on leading the clean lifestyle movement, reported second quarter 2021 financial results for the three and six months ended June 30, 2021.
>
> "The underlying strength and financial performance of our overall business for the first half of 2021 reflects the ongoing success of our strategic initiatives focused on Content, Community, Commerce, and our powerful innovation and category expansion," said Nick Vlahos, Chief Executive Officer of The Honest Company. "For the first half of 2021, we were pleased to deliver 8% revenue and volume growth on top of the accelerated COVID stock-up surge of 25% revenue growth that we saw in the first half of 2020 as compared to

the first half of 2019. We also exceeded our gross margin expectations for the overall business in the first half of 2021, showing the strength of our business at a time when our entire industry faced a challenging input cost, inventory and supply chain environment."

Vlahos continued, "During the second quarter we saw positive consumer response to our new Clean Conscious Diaper and marketing innovation with over 17% retail consumption growth for Honest's Diapers, Wipes and Personal Care products as measured by syndicated data for the thirteen-weeks ended June 27, 2021. This growth is on top of the significant COVID-19 stock-up we experienced in the Diapers and Wipes category in 2020. As we look to the remainder of the year, we continue to have confidence in our three year strategic plan, Strategy 2023, and are focused on executing with excellence to deliver shareholder value over the long-term and solidify Honest's position as the next generation, modern CPG company."

**Second Quarter Highlights**

- **Revenue** grew 3% from the second quarter of 2020; excluding an estimated $3.7 million COVID-19 stock-up impact primarily in Diapers and Wipes in the prior year period, revenue growth was 9%[]:
  - ***Skin and Personal Care*** revenue increased 16% from the second quarter of 2020 and increased 39% as compared to the second quarter of 2019.
  - ***Diapers and Wipes*** declined 2% as compared to the second quarter of 2020 with mid-single digit growth in diapers offset by the 2020 COVID-19 stock-up impact in the prior year period. Diapers and Wipes grew 17% as compared to the second quarter of 2019.
  - ***Household and Wellness*** revenue declined 6% from the second quarter of 2020 as consumer and customer demand for sanitization products decreased as consumers became vaccinated and customers managed heavy levels of inventory. Household and Wellness declined 31% as compared to the second quarter of 2019 as we simplified the product portfolio while discontinuing certain non-core products that did not align with our revamped product strategy.
- **Gross margin** was 36% representing a decrease of 50 basis points from the second quarter of 2020 and expansion of 710 basis points from the second quarter of 2019; notably, gross margin expanded 110 basis points from the first quarter of 2021; the gross margin decline from the second quarter of 2020 was driven by more normalized levels of trade spend; the expansion in gross margin versus the second quarter of 2019 and the first

quarter of 2021 was driven in part by our cost savings and product mix initiatives

- **Net loss** was $20.0 million (including one-time IPO related costs and other transaction-related expenses) and **adjusted EBITDA** was a loss of $0.8 million for the second quarter of 2021

84. On this news, the price per share of the Company's common stock fell $3.98, or approximately 28%, closing at $10.07 per share on August 13, 2021. By August 19, 2021, the Company's share price had declined further, closing at an $9.16 per share, representing a decline of nearly 43% from the IPO price per share of $16.00.

## DAMAGES TO HONEST

85. As a direct and proximate result of the Individual Defendants' misconduct, Honest has lost and will continue to lose and expend many millions of dollars.

86. Such expenditures include, but are not limited to, fees associated with the Securities Class Actions filed against the Company and the Securities Action Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

87. Such expenditures further include the expenses associated with the Stockpiling Misconduct, including but not limited to expenses associated with the Company's $5.7 million increase in inventory during the first six months of 2021.

88. Such expenditures further include payments under the 2021 Dividend, which were made on or around June 29, 2021 and which totaled $35 million, of which approximately $25 million went to entities affiliated with Defendants Dahnke, Liaw, Liew, Pramanik, Vlahos, and Warren.

89. Additionally, these expenditures include, but are not limited to, lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses paid related to preparation of the IPO that triggered upon the IPO's closing.

90. As a direct and proximate result of the Individual Defendants' conduct, Honest has also suffered and will continue to suffer a loss of reputation and goodwill, and

a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

91. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

92. Plaintiff brings this action derivatively and for the benefit of Honest to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Honest, unjust enrichment, the aiding and abetting thereof, as well as for contribution under Section 11(f) of the Securities Act and 21D of the Exchange Act.

93. Honest is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

94. Plaintiff is, and has been at all relevant times, a shareholder of Honest. Plaintiff will adequately and fairly represent the interests of Honest in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

95. A pre-suit demand on the Board of Honest is futile and, as a result, excused. At the time of filing, the Board consists of the following nine individuals: Defendants Vlahos, Bayne, Dahnke, Gentile, Liaw, Liew, Pramanik, Warren, and White (collectively, the "Directors"). Plaintiff only needs to allege demand futility as to five of the nine Directors who are on the Board at the commencement of this action.

96. Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme described herein that they engaged in knowingly or recklessly, in which they made and/or caused the Company to make false and misleading statements and omissions of material facts and to engage in the Stockpiling Misconduct. This renders the Directors unable to

impartially investigate the charges and decide whether to pursue action against themselves as well as other perpetrators.

97. In total breach of their fiduciary duties, the Directors knowingly or recklessly participated in the scheme to cause Honest to issue false and misleading statements and to engage in the Stockpiling Misconduct. Despite their affirmative disclosure obligations, the Directors failed to correct the false and misleading statements throughout the Relevant Period. The fraudulent scheme was intended to make the Company appear more profitable, and therefore attractive, to investors. Moreover, the Directors caused the Company to fail to maintain internal controls, as evidenced by, *inter alia*, the failure to establish an internal audit function. As a result of which, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and therefore excused.

98. Demand is also futile on Defendant Vlahos for the following, additional, reasons. Defendant Vlahos has served as Honest's CEO and as a member of the Board since March 2017. The Company provides Defendant Vlahos with his principal occupation for which he receives handsome compensation, as described above. He is thus, as Honest admits, a non-independent director. As CEO, Defendant Vlahos was ultimately responsible for all of the false and misleading statements and omissions of material fact that were made during the Relevant Period, including those in the 2021Q1 10-Q, which he signed and for which he also signed SOX certifications. Moreover, Defendant Vlahos signed, and therefore personally made, the materially false and misleading statements in the Registration Statement. As a result of the significant compensation he receives for his role as CEO, he cannot dispassionately consider a demand to sue the directors that control his continued employment, other members of management with whom he has or still works, and himself. Moreover, Defendant Vlahos is a defendant in the Securities Class Actions. As the CEO of Honest and as a trusted member of the Board, he failed to conduct adequate oversight of the scheme to cause the Company to make false and misleading statements

and to cause the Company to engage in the Stockpiling Misconduct. Furthermore, he consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and he consciously disregarded his duties to protect corporate assets. In addition, Defendant Vlahos failed to correct the false and misleading statements during the Relevant Period. For these reasons, he breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested. Accordingly, demand upon Defendant Vlahos is futile and, thus, excused.

99. Demand is also futile on Defendant Bayne for the following, additional, reasons. Defendant Bayne has served as a member of the Board Company director since October 2018. In addition, during the Relevant Period, she served as Chair of the Compensation Committee and as a member of the Audit Committee. Defendant Bayne receives significant compensation from the Company for her services as a director and as a member of the Board's committees. Defendant Bayne signed, and thus personally made, the false and misleading statements contained in the Registration Statement. Moreover, Defendant Bayne is employed as a Senior Advisor by Guggenheim Securities, and Guggenheim Securities, LLC served as an underwriter for the IPO and is a defendant in one of the Securities Class Actions. Due to her employment by an underwriter allegedly involved in the misconduct, Defendant Bayne cannot act independently and in the best interests of Honest and its shareholders, as her action in doing so would be adverse to the interests of her employer Guggenheim Securities, thereby posing a risk to Defendant Bayne's continued employment. As a trusted member of the Board, Defendant Bayne failed to conduct adequate oversight of the scheme to cause the Company to make false and misleading statements and to cause the Company to engage in the Stockpiling Misconduct. Furthermore, she consciously disregarded her duties to monitor controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, throughout the Relevant Period, she failed to correct the false and misleading statements. For these reasons, Defendant Bayne breached her fiduciary

duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon her is futile and, thus, excused.

100. Demand is also futile on Defendant Dahnke for the following, additional, reasons. Defendant Dahnke has served as a member of the Board since June 2018, for which he receives significant compensation from the Company. Defendant Dahnke is one of two members of a managing board of the general partner of THC Shared Abacus, LP. THC Shared Abacus, LP sold 19,017,945 shares of the Company's Common stock on May 7, 2021 at a price of $16 per share, for proceeds of approximately $304 million. Defendant Dahnke thus directly benefitted from the scheme described herein, illustrating his motive to engage in the scheme. Moreover, Defendant Dahnke signed, and thus personally made, the false and misleading statements contained in the Registration Statement. As a trusted member of the Board, he failed to conduct adequate oversight of the scheme to cause the Company to make false and misleading statements and to cause the Company to engage in the Stockpiling Misconduct. Furthermore, he consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and he consciously disregarded his duties to protect corporate assets. In addition, throughout the Relevant Period, he failed to correct the false and misleading statements. For these reasons, Defendant Dahnke breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is futile and, thus, excused.

101. Demand is also futile on Defendant Gentile for the following, additional, reasons. Defendant Gentile has served as a member of the Board since May 4, 2021, and she also served as the Audit Committee's Chair during the Relevant Period. Defendant Gentile receives significant compensation for her role on the Board and as Audit Committee Chair. As a trusted member of the Board and as Audit Committee Chair, she failed to conduct adequate oversight of the scheme to cause the Company to make false and misleading statements and to cause the Company to engage in the Stockpiling Misconduct. Furthermore, she consciously disregarded her duties to monitor controls over

reporting and engagement in the scheme, and she consciously disregarded her duties to protect corporate assets. In addition, throughout the Relevant Period, she failed to correct the false and misleading statements. For these reasons, Defendant Gentile breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon her is futile and, thus, excused.

102. Demand is also futile on Defendant Liaw for the following, additional, reasons. Defendant Liaw has served as a member of the Board since November 2013. In addition, he served as a member of the Audit and Compensation Committees during the Relevant Period. Defendant Liaw is a General Partner of Institutional Venture Partners XIII, L.P., which sold 1,200,000 Company shares in the IPO for proceeds of $19.2 million and which beneficially owned 11.5% of the Company following the IPO. Defendant Liaw thus directly benefitted from the scheme described herein, illustrating his motive to engage in the scheme. Defendant Liaw receives to significant compensation for his role at the Company. As a trusted member of the Board, he failed to conduct adequate oversight of the scheme to cause the Company to make false and misleading statements and to cause the Company to engage in the Stockpiling Misconduct. Furthermore, he consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and he consciously disregarded his duties to protect corporate assets. In addition, throughout the Relevant Period, he failed to correct the false and misleading statements. For these reasons, Defendant Liaw breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is futile and, thus, excused.

103. Demand is also futile on Defendant Liew for the following, additional, reasons. Defendant Liew has served as a member of the Board since September 2011, and he served as a member of the Nominating and Corporate Governance Committee during the Relevant Period. Defendant Liew receives significant compensation for his role at the Company. Defendant Liew is a director of the general partner of the general partner of

Lightspeed Venture Partners Select, L.P., which sold 82,648 shares of Company common stock on May 7, 2021 in connection with the IPO, for proceeds of $1,322,368. Defendant Liew thus directly benefitted from the scheme described herein, illustrating his motive to engage in the scheme. As a trusted member of the Board, he failed to conduct adequate oversight of the scheme to cause the Company to make false and misleading statements and to cause the Company to engage in the Stockpiling Misconduct. Furthermore, he consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and he consciously disregarded his duties to protect corporate assets. In addition, throughout the Relevant Period, he failed to correct the false and misleading statements. For these reasons, Defendant Liew breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is futile and, therefore, excused.

104. Demand is also futile on Defendant Pramanik for the following, additional, reasons. Defendant Pramanik has served as a member of the Board since June 2018, and he served as a member of the Compensation and Nominating and Corporate Governance Committees during the Relevant Period. Defendant Pramanik receives significant compensation for his role at the Company. Defendant Pramanik is a Partner at *L* Catterton, a private equity firm affiliated with THC Shared Abacus, LP, which sold 19,017,945 shares of Company common stock in the IPO for proceeds of approximately $304 million. Defendant Pramanik thus directly benefitted from the scheme described herein, illustrating his motive to engage in the scheme. As a trusted member of the Board, Defendant Pramanik failed to conduct adequate oversight of the scheme to cause the Company to make false and misleading statements and to cause the Company to engage in the Stockpiling Misconduct. Furthermore, he consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and he consciously disregarded his duties to protect corporate assets. In addition, throughout the Relevant Period, he failed to correct the false and misleading statements throughout the Relevant Period. For these reasons,

Defendant Pramanik breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is futile and, thus, excused.

105. Demand is also futile on Defendant Warren for the following, additional, reasons. Defendant Warren was one of the Company's founders in 2011. She currently serves as CCO and as a director, and was formerly the Board's Chair. Defendant Warren receives handsome compensation for her role at the Company, including a base salary of $600,000. Thus, she is a non-independent director, as the Company admits. As one of the Company's founders and as a member of the Board, she failed to conduct adequate oversight of the scheme to cause the Company to make false and misleading statements and to engage in the Stockpiling Misconduct. Furthermore, she consciously disregarded her duties to monitor controls over reporting and engagement in the scheme, and she consciously disregarded her duties to protect corporate assets. In addition, throughout the Relevant Period, she failed to correct the false and misleading statements. For these reasons, Defendant Warren breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon her is futile and, thus, excused.

106. Additional reasons that demand on Defendant White is futile follow. Defendant White has served as the Board's Chair since May 4, 2021, and he also served during the Relevant Period as Chair of the Nominating and Corporate Governance Committee. Defendant White receives significant compensation for his role at the Company, as described above. As a trusted member of the Board, he failed to conduct adequate oversight of the scheme to cause the Company to make false and misleading statements and to cause the Company to engage in the Stockpiling Misconduct. Furthermore, he consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and he consciously disregarded his duties to protect corporate assets. In addition, throughout the Relevant Period, he failed to correct the false and

misleading statements. For these reasons, Defendant White breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is futile and, thus, excused.

107. Additional reasons that demand on the Board is futile follow.

108. There are longstanding business and personal relationships between the Directors and between the Directors and the Individual Defendants that preclude the Directors from acting independently and in the best interests of Honest and its shareholders. For instance, two Directors are linked through *L* Catterton Partners, where Defendant Pramanik is a partner and Defendant Dahnke is co-CEO. THC Shared Abacus, LP, a fund which sold approximately $304 million of Company stock in the IPO and which beneficially owned 13.5% of the Company following the IPO, is affiliated with *L* Catterton Partners. Thus, due to these relationships, Defendants Pramanik and Dahnke cannot independently and disinterestedly investigate one another or any of the other individuals or entities that sold stock in the IPO. In another connection, two Directors worked in senior positions at The Clorox Company ("Clorox"). Specifically, Defendant Gentile held multiple management roles at Clorox from 2006 to 2013, including Vice President – Controller & Chief Accounting Officer. Defendant Vlahos joined Clorox in 1995 and held numerous roles within that company before serving at subsidiaries of Clorox. He served as Vice President – General Manager, Laundry, Brita and Green Works from March 2009 to February 2011, and then as Vice President – General Manager, Burt's Bees from April 2011 to February 2013. Vlahos later returned to Clorox to serve as Executive Vice President and Chief Operating Officer – Household, Lifestyle and Core Global Functions. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and from adequately overseeing or investigating the Individual Defendants' conduct. As a result of the foregoing, demand upon the Directors would be futile.

109. The Board declared the 2021 Dividend in April 2021, just prior to the IPO. The 2021 Dividend was a cash dividend of $35 million to the holders of record of its common stock and redeemable convertible preferred stock as of May 3, 2021, a record date occurring just prior to the Company going public. The 2021 Dividend was paid out on or around June 29, 2021, and $20.6 million of the total was paid to holders of Honest's redeemable convertible preferred stock. Defendants Bayne, Dahnke, Liaw, Liew, Pramanik, Vlahos, and Warren were the Company's directors when the Board approved the 2021 Dividend. As discussed above, entities affiliated with these directors received substantial payments pursuant to the 2021 Dividend, including the following amounts: (1) $13,108,764 to THC Shared Abacus, LP, a fund affiliated with *L* Catterton Partners, of which Defendant Dahnke is co-CEO and Defendant Pramanik is a partner; (2) $4,853,915 to Institutional Venture Partners XIII, L.P., of which Defendant Liaw is a General Partner; (3) $4,293,952 to entities affiliated with Lightspeed Venture Partners, and Defendant Liew is a director of the general partner of the general partner of Lightspeed Venture Partners Select, L.P.; (4) $2,633,660 to entities affiliated with Defendant Warren; and (5) $35,107 to Nikolaos and Angela Vlahos 2006 Trust, of which Defendant Vlahos and his wife are trustees and thereby share voting and investment power. Thus, Defendants Dahnke, Liaw, Liew, Pramanik, Vlahos, and Warren used their power and control over Honest to cause the Company to pay handsome dividends to themselves or to their affiliated entities amounting to almost $25 million. The 2021 Dividend was paid even though the Company suffered a net loss of $20 million in the second quarter of 2021—the quarter in which the 2021 Dividend was paid—when sales were decelerating and the Individual Defendants were causing the Company to issue false and misleading statements and to engage in the Stockpiling Misconduct. Defendants Bayne, Dahnke, Liaw, Liew, Pramanik, Vlahos, and Warren are therefore directly implicated in the unjust enrichment of Defendants Dahnke, Liaw, Liew, Pramanik, Vlahos, and Warren through the payment 2021 Dividend. Accordingly, the misconduct of Defendant Bayne, Dahnke, Liaw, Liew, Pramanik, Vlahos,

and Warren in causing the Company to pay the 2021 Dividend precludes them from acting independently and disinterestedly in investigating the misconduct described herein. In addition, because the 2021 Dividend was paid on June 29, 2021, at a time when all nine Directors served on the Board, demand upon the entire Board is futile and, thus , excused

110. Defendants Gentile (as Chair), Bayne, and Liaw (the "Audit Committee Defendants") were members of the Audit Committee during the Relevant Period. The Audit Committee Defendants are responsible for overseeing, *inter alia*, the quality and integrity of Honest's financial statements, Honest's compliance with applicable laws and regulations, the Honest's system of internal controls, and the implementation of Honest's internal audit function. In contravention of their responsibilities, the Audit Committee Defendants failed to ensure the integrity of Honest's financial statements and internal controls and failed to ensure that the Company complied with applicable laws and regulations. Furthermore, the Audit Committee Defendants failed to implement an internal audit function. According to the Company's Audit Committee Charter, the Company still lacks an internal audit function as of the date of this filing. The Audit Committee Defendants also failed to ensure that adequate internal controls were in place, causing the Company to issue false and misleading financial statements to investors, and to file a false and misleading quarterly report with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties and are not disinterested. Accordingly, demand is excused as to them.

111. In violation of the Company's Code of Business Conduct and Ethics (the "Code of Conduct"), the Directors failed to conduct adequate oversight of Honest's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment. In further violation of the Code of Conduct, the Directors failed to comply with applicable laws and regulations, maintain accurate Company records and reports,

avoid conflicts of interest, conduct business in an honest and ethical manner, and report violations of the Code of Conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

112. The Company has been and will continue to be exposed to significant losses due to the wrongdoing described herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for the Company any part of the damages it suffered and will continue to suffer. Thus, demand upon the Directors is excused as being futile.

113. The Individual Defendants' conduct could not have been the product of legitimate business judgment because it was based in bad faith and intentional, reckless, or disloyal misconduct. Therefore, no Director can claim exculpation from his or her violations of duty in accordance with the Company's charter, to the extent such a provision exists. As each of the Directors faces a substantial likelihood of liability, the Directors are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to commence any action on behalf of the Company's shareholders. Therefore, demand is futile and, thus, excused.

114. The acts complained of herein are incapable of ratification because they constitute violations of fiduciary duties owed by Honest's officers and directors.

115. The Directors may be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to Honest stockholders. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Honest, there would be no directors'

and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Therefore, demand on the Directors excused as being futile.

116. If there is no directors' and officers' liability insurance, then the Directors will not cause Honest to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile for that reason, as well.

117. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

## Against the Individual Defendants for Breach of Fiduciary Duties

118. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

119. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Honest's business and affairs.

120. Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

121. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Honest.

122. In breach of their fiduciary duties owed to Honest, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading

statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's business, operations, and prospects were significantly impacted by stockpiling of the Company's products; (2) despite the likely impacts of consumer and customer stockpiling behavior on the Company's future prospects, the Company engaged in the Stockpiling Misconduct to support future sales and growth, which were not reasonably likely to materialize; (3) demand for the Company's products was decelerating; (4) as a result of the foregoing, Honest's financial results were likely to be materially negatively impacted; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading at all relevant times.

123. After making the false and misleading statements in connection with the Company's IPO, the Individual Defendants made false and misleading statements during the Relevant Period, including in the Prospectus and the 2021Q1 10-Q. Moreover, throughout the Relevant Period, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

124. Also in breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the Stockpiling Misconduct.

125. Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls, as evidenced by the continued failure to establish an internal audit function.

126. The Individual Defendants had actual or constructive knowledge that the Honest issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose

such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

127. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Honest's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

128. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

129. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Honest has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

130. Plaintiff on behalf of Honest has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Unjust Enrichment

131. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

132. By their wrongful acts, violations of law, false and misleading statements and omissions of material fact that they made and/or caused to be made, and their conduct in

causing the Company to pay the 2021 Dividend, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Honest.

133. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Honest that was tied to the performance or artificially inflated valuation of Honest, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

134. This includes proceeds from the sales of the Company's securities in connection with the IPO, when the Company's share price was artificially inflated. This also includes compensation resulting from the payment of the 2021 Dividend, which was paid on June 29, 2021. This further includes bonuses paid related to preparation for the IPO that triggered upon the closing of the IPO. Additionally, this includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

135. Plaintiff, as a shareholder and a representative of Honest, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the 2021 Dividend, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

136. Plaintiff on behalf of Honest has no adequate remedy at law.

## THIRD CLAIM

### Against the Securities Action Defendants for Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act

137. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

138. As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Actions brought on behalf of Honest shareholders, in

which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

139. Federal law provides Honest with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

140. The plaintiffs in the Securities Class Actions allege that the Registration Statement—including its amendments—and the Prospectus contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

141. Honest is the registrant for the IPO. The Securities Action Defendants were responsible for the contents and dissemination of the Registration Statement and Prospectus.

142. As issuer of the shares, the Company is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

143. The plaintiffs in the Securities Class Actions allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were true and without omissions of any material facts and were not misleading.

144. The Securities Action Defendants, because of their positions of control and authority as officers and directors of Honest, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Honest, including the wrongful acts complained of herein and in the Securities Class Actions.

145. Accordingly, the Individual Defendants are liable under Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)), which creates a private right of action for contribution, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

146. As such, Honest is entitled to receive all appropriate contribution or indemnification from the Securities Action Defendants.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Honest, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Honest;

(c) Determining and awarding to Honest the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Honest and the Individual Defendants to take all necessary actions to reform and improve the Company's corporate governance and internal procedures to comply with applicable laws and to protect Honest and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the Company's shareholders to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding the Company restitution from Individual Defendants, and

each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: December 17, 2021

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/Laurence M. Rosen*

Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

**VERIFICATION**

I, Mike Wang am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of 12/16/2021, 2021.




Mike Wang